## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:07CR234 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| WENSCELAO ARRAIZA, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress filed by defendant Wenscelao Arraiza (Arraiza) (Filing No. 16). Arraiza is charged in the Indictment with the possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Arraiza seeks to suppress evidence obtained by the Nebraska State Patrol (NSP) on June 10, 2007, following a traffic stop of his vehicle on Interstate 80 in Lancaster County, Nebraska. Arraiza seeks the suppression of evidence seized from his vehicle, any evidence seized from Arraiza's person, and any statements Arraiza made to the NSP.

An evidentiary hearing was held on Arraiza's motion on October 17, 2007. Arraiza was present for the hearing along with his appointed counsel, Assistant Federal Public Defender Julie B. Hansen. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. During the hearing, the court heard the testimony of NSP Trooper David Louis Frye (Trooper Frye). The court also received into evidence a videotape with audio of the traffic stop (Exhibit 1), photographs of Arraiza's vehicle (Exhibits 2 and 3), and an NSP Spanish language permission to search form (Exhibit 4). A transcript of the hearing (TR.) was filed on October 22, 2007 (Filing No. 31). Arraiza and the government each filed a supplemental memorandum on October 23, 2007 (Filing Nos. 33 and 34).

### FINDINGS OF FACT

On June 10, 2007, Trooper Frye was assigned to the NSP Traffic Services Division, stationed in Lincoln, Nebraska, and assigned a patrol area of Lincoln to the Platte River on Interstate 80 (TR. 7). Trooper Frye was in uniform and alone in a marked NSP patrol cruiser (TR. 8). As Trooper Frye was traveling eastbound on Interstate 80 in Lancaster

County, he observed a red Ford Explorer with California license plates traveling ahead of him (TR. 9). While traveling in a 65 mile per hour zone, the Ford Explorer appeared to brake and slow to 55 miles per hour when Trooper Frye's cruiser appeared behind the Ford Explorer (TR. 9). Trooper Frye was traveling in the left passing lane and the Ford Explorer was traveling in the right driving lane (TR. 10). The Ford Explorer's reaction seemed very unusual to Trooper Frye (TR. 10). Trooper Frye observed the Ford Explorer to be clean and the front wheel well was as clean as the vehicle (TR. 11). However, the rear wheel well appeared to have been sprayed with mud by a hopper gun (TR. 11). Trooper Frye drove alongside, observed an air freshener hanging from the rear view mirror, and then fell behind the Ford Explorer (TR. 12). Trooper Frye allowed the Ford Explorer to create some distance between itself and Trooper Frye's patrol cruiser, and Trooper Frye continued to observe the Ford Explorer from behind (TR. 13). As the Ford Explorer accelerated (but still within the posted speed limit), Trooper Frye observed the Ford Explorer approach a black sports car, signal a pass, and pass in the left passing lane (TR. 13-14). As the Ford Explorer passed the sports car, the Ford Explorer quickly merged back into the right driving lane with only 15 to 20 feet between the vehicles creating an unsafe condition for the sports car (TR. 14). The sports car reacted by hitting its brakes to create more space between the vehicles (TR. 14).

After the sports car had created a gap between the Ford Explorer and itself, Trooper Frye decided to stop the Ford Explorer for following too closely and for the air freshener view obstruction (TR. 14). Trooper Frye pulled in behind the Ford Explorer and activated the cruiser's red lights (TR. 14). The stop occurred past the Waverly interchange near mile marker 411 on eastbound Interstate 80 (TR. 15). The stop occurred at approximately 1:10 p.m. on a sunny day (TR. 18). Trooper Frye walked to the Ford Explorer and asked, in English, the driver, Arraiza, for Arraiza's driver's license, vehicle registration, and insurance card and directed Arraiza to come back to Trooper Frye's patrol unit (TR. 18).[1] Arraiza brought the documents back to the patrol unit (TR. 19). Trooper Frye began to prepare a warning ticket and engaged Arraiza in conversation (TR. 19-20). When Trooper Frye asked

---

[1] The entire stop was recorded on video and audio tape through Trooper Frye's patrol vehicle's in-car recording device (Exhibit 1).

Arraiza where Arraiza was headed, Arraiza told Trooper Frye he was going to Chicago for work (TR. 20).  When asked who he was going to work for, Arraiza told Trooper Frye he didn't know but his friend was going to help him find work; however he did not remember his friend's name (TR. 20-21).  Arraiza said he was a framer and there was not enough work in California (TR. 21).  Trooper Frye repeated the question regarding Arraiza's friend's name, but Arraiza had no answer to the question and apologized (TR. 21-22).  Trooper Frye asked Arraiza about the Ford Explorer which was not registered to Arraiza (TR. 24).  Arraiza told Trooper Frye the vehicle belonged to Esquivel Rodriguez (TR. 24).  Arraiza said he was going to be in Chicago for a month or two (TR. 25).  Trooper Frye completed the warning for vision obstruction and following too close and handed Arraiza the ticket (TR. 25).

      Trooper Frye then told Arraiza that the traffic stop was concluded, handed Arraiza back Arraiza's documents, and asked if Trooper Frye could speak with him further (TR. 25-26).  Arraiza agreed (TR. 26).  Trooper Frye asked Arraiza if there was anything illegal in the Ford Explorer and listed numerous items of contraband (TR. 26).  Arraiza said he had none of those items (TR. 27).  Trooper Frye then asked Arraiza if Trooper Frye could search Arraiza's vehicle (TR. 27).  Up to this time Trooper Frye had been conversing with Arraiza in English and Arraiza had been responding in English (TR. 28).  Arraiza appeared to be very nervous and fidgety and his hands were trembling when Trooper Frye gave back Arraiza's paperwork (TR. 31-32).  Trooper Frye described how Arraiza's nervousness was more unusual than that of the ordinary driver stopped (TR. 32-33).  When asked if Trooper Frye could search, Arraiza reacted by just looking at Trooper Frye (TR. 28).  Trooper Frye then asked in Spanish for Arraiza's permission to search the Ford Explorer (TR. 28).  Trooper Frye asked "May permiter rejistar rebuscar el caro?" (TR. 28-29).  The court interpreter translated the phrase as "Can I to be allowed register we search the vehicle ?" (TR. 29).  Arraiza agreed to the search (TR. 29).  Trooper Frye retrieved a Spanish language consent to search form, presented it to Arraiza, and had Arraiza read the form aloud (Exhibit 4; TR. 29).  Arraiza read the form aloud in Spanish, Trooper Frye asked if Arraiza understood the form, and Arraiza stated he understood (TR. 30).  Trooper Frye

3

asked Arraiza to sign the form if it was okay for Trooper Frye to search the vehicle (TR. 30). Arraiza signed the form (TR. 31; Exhibit 4).

Trooper Frye asked Arraiza to remain in the patrol vehicle while Trooper Frye searched the Ford Explorer (TR. 31 ). Trooper Frye found a compartment in the rear wheel well area in which he found 15 packages of cocaine (TR. 37-38). The cocaine was seized and Arraiza was arrested (TR. 41). While Arraiza indicated he may provide Trooper Frye with a statement, when Arraiza arrived at the jail facility and was advised of his rights by an interpreter from the Lincoln Police Department, Arraiza changed his mind and declined to make any further statements (TR. 42).

## LEGAL ANALYSIS

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." **United States v. $404,905.00 in U.S. Currency,** 182 F.3d 643, 646 (8th Cir. 1999) **citing Pennsylvania v. Mimms**, 434 U.S. 106, 109 (1977). Arraiza asserts the air freshener hanging from his rear view mirror did not constitute a vision obstruction warranting the stop of the Ford Explorer by Trooper Frye. Trooper Frye believed it did constitute an obstruction and the evidence is clear that such an air freshener was hanging from the rear view mirror (Exhibit 2). The courts must give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." **United States v. Washington**, 109 F.3d 459, 465 (8th Cir. 1997). Furthermore, the principal reason for the stop was Arraiza's following too closely to the sports car and cutting in front of the sports car after Arraiza passed the sports car. As such, Trooper Frye had probable cause to stop the Ford Explorer.

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. **$404,905.00,** 182 F.3d at 647; **see also United States v. Sokolow**, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. **$404,905.00,** 182 F.3d at 647; **United States v. Allegree,** 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as

4

necessitated by the information volunteered by the motorist and observations of the contents of the vehicle. **$404,905.00**, 182 F.3d at 647; **Allegree,** 175 F.3d at 650-51. In this case, Trooper Frye articulated a reasonable suspicion of illegal activity due to the "mud" applied in the rear wheel well (a pattern observed in previous drug seizures), the air freshener, Arraiza's bizarre responses to the Trooper Frye's questions concerning Arraiza's itinerary, and Arraiza's nervousness. All would constitute a basis to detain Arraiza for further investigation under **Terry v. Ohio**, 392 U.S. 1 (1968). However, Arraiza consented to the search of the Ford Explorer following the actual traffic stop. Therefore, further discussion of an investigative detention is unnecessary.

A consent search must be voluntary. "A search may be constitutionally valid either where it is supported by a reasonable suspicion or by valid consent." **United States v. Morris**, 910 F. Supp. 1428, 1446 (N.D. Iowa 1995) (internal citations omitted). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." **Id.** (internal citations omitted). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." **Ohio v. Robinette,** 519 U.S. 33, 40 (1996). The videotape (Exhibit 1), which is clear and audible, leads the viewer to conclude Arraiza voluntarily consented to the search of the Ford Explorer. While Arraiza spoke halting English, he and Officer Frye conversed in English and Arraiza responded to the colloquy appropriately. Furthermore, Arraiza read and signed a Spanish language consent to search form provided by Trooper Frye. While there may be a semantical distinction between the words "registrar" (to register) and "escular" (to search) in the Spanish language, the clear intent of the form and the conversation between Arraiza and Trooper Frye was that Arraiza was giving permission for Officer Frye to search the Ford Explorer. **See United States v. Perez-Llanes**, 2005 WL 1138507 (8th Cir. May 26, 2005).

From the evidence presented, the court finds from the totality of circumstances that Arraiza voluntarily consented to the search of the Ford Explorer and Arraiza's motion to suppress should be denied.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Arraiza's motion to suppress (Filing No. 16) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 18th day of December, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge